UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
ZEKI KOCHISARLI,

                Plaintiff,

          - against -

HAROLD J. TENOSO a/k/a HAL, ALAN
MORRISON HAY, FRANCES GRIFFIN,
FMB HOLDINGS LLC,

                Defendants.
----------------------------------X
FRANCES GRIFFIN and FMB HOLDINGS
LLC,

                Counter-claimants,

         - against -

ZEKI KOCHISARLI,

                Counter-defendant.
----------------------------------X

**MEMORANDUM & ORDER**
02-CV-4320 (DRH) (MLO)

**APPEARANCES:**

**QUADRINO & SCHWARTZ, P.C.**
Attorneys for Kochisarli
666 Old Country Road, 9th Floor
Garden City, NY 11530
By: Harold J. Levy, Esq.

**BOOKER, RABINOWITZ, TRENK, LUBETKIN, TULLY, DiPASQUALE & WEBSTER, P.C.**
Attorneys for Tenoso
100 Executive Drive, Suite 100
West Orange, NY 07052
By: Richard D. Trenk, Esq., & Henry M. Karwowski, Esq.

**DEAN BROWNING WEBB, ESQ.**
Attorney for Hay, Griffin, and FMB Holdings LLC
8002 N.E. Highway 99, Suite B - PMB # 256
Vancouver, WA 98665-8833

*INTRODUCTION*

Before the Court are four motions by the various parties in this dispute. Plaintiff Zeki Kochisarli ("Plaintiff") brought the present action against Defendants Harold Tenoso ("Tenoso"), Alan Morrison Hay ("Hay"), Frances Griffin ("Griffin"), and FMB Holdings ("FMB") following his purported default on a loan agreement, seeking to have the loan declared void. Plaintiff now moves to amend the original complaint; Defendant Tenoso seeks summary judgment as to his counterclaim; Plaintiff moves to dismiss the counterclaims of Defendants FMB and Griffin (jointly, "Counter-claimants"); and Plaintiff moves for Rule 11 sanctions against Dean Browning Webb, Esq. ("Mr. Webb"), the attorney for Counter-claimants.

*BACKGROUND*

The following summary of facts is drawn primarily from the Court's March 29, 2005 Memorandum. The facts are undisputed unless where otherwise noted.

Plaintiff is a gold jewelry craftsman. On or about April 23, 2001, experiencing financial difficulties and facing default on a prior outstanding loan obligation, he entered into a loan agreement with Tenoso. Plaintiff executed a mortgage note with a principal sum of $350,000.00, a mortgage on a commercial property in Long Island City that he owned, and a loan settlement sheet. Pursuant to the mortgage, Plaintiff granted Tenoso a secured interest in the Long Island City property. The loan agreement provided Tenoso with an option to purchase that property in the event that Plaintiff defaulted on the loan.

According to Plaintiff, he was supposed to use a portion of the loan to prevent foreclosure on his earlier debt, and furnish the remaining funds to Defendant FMB. Defendant FMB is managed by Defendant Griffin, Tenoso's sister, who is married to Defendant Hay. With the funds furnished

to it, Defendant FMB was to buy gold as a raw material for jewelry manufacture. Accordingly, the loan agreement states that "the proceeds of this loan will be furnished to FMB, L.L.C. (the 'Guarantor') in the operation of [Plaintiff]'s jewelry manufacturing business. Specifically, the proceeds are to be used to purchase gold to be used in the manufacture of jewelry." Plaintiff claims that $250,000 of the loan went directly to FMB, but that he never received any of the proceeds. Plaintiff also claims that he never made any payments on the loan, and thought that all payments in the first year of the loan would be made by FMB.

According to Plaintiff, FMB made every monthly loan payment until April 2002, when neither Plaintiff nor FMB made the required payment. As a result, Tenoso declared the loan in default, accelerated the loan payments, and notified Plaintiff that he intended to exercise his option to purchase the Long Island City property, as per the loan agreement. Plaintiff claims that Hay, Griffin and FMB were hired by Tenoso to act as his agents in selling the property.

On April 22, 2002, Plaintiff filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Eastern District of New York. On May 1, 2002, Tenoso filed a motion to be relieved from the automatic bankruptcy stay placed on Plaintiff's assets. In Tenoso's verification in support of that motion, he claimed that Plaintiff's total obligation to Tenoso was $521,136. On September 10, 2002, Tenoso filed three "proof of claim" forms with the bankruptcy court. First, Tenoso claimed that Plaintiff owed him $950,000. Then Tenoso claimed that Plaintiff owed him $480,931.75, plus late fees and attorneys fees. Finally, Tenoso claimed that Plaintiff was indebted to him for an "unknown" amount. On October 25, 2002, U.S. Bankruptcy Judge Stan Bernstein ordered the sale of Plaintiff's property; it was sold for the sum of $2,200,000.00. The Bankruptcy

Court also ordered Plaintiff to pay $600,000 from the proceeds of this sale into an escrow account, to satisfy a potential future judgment in Tenoso's favor.

Plaintiff commenced the present action in New York Supreme Court, Nassau County, on June 27, 2002. He claimed, *inter alia*, that Tenoso loaned him money under terms that were usurious, unconscionable, and unenforceable. Tenoso filed a counterclaim demanding payment of the loan, which states that Tenoso had disbursed loan proceeds to Plaintiff, but that Plaintiff "defaulted under and breached the loan agreement." Defendants Hay, Griffin and FMB, also filed numerous counterclaims against Plaintiff, alleging various civil-RICO violations. The parties do not agree on who owes how much to whom.

Tenoso removed the action to this Court in early August, 2002, on the basis of diversity and bankruptcy jurisdiction, and on August 19, 2002, informed the Court that he intended to file a motion to dismiss the complaint, and requested a pre-motion conference pursuant to the Court's Individual Rules. On October 3, 2002, Tenoso submitted a letter motion to stay discovery pending disposition of his dismissal motion; Plaintiff responded by letter the following day, opposing the request. On November 20, 2002, U.S. Magistrate Judge Michael Orenstein set a discovery schedule as to all parties except Tenoso, whom he exempted from discovery in light of the forthcoming dismissal motion.

In April 2003, Plaintiff moved for summary judgment as to the first count of his complaint against Tenoso. Specifically, Plaintiff sought judgment as a matter of law that the loan from Tenoso was void or unenforceable because it was based upon the transfer of a deed in lieu of foreclosure and thus unconscionable, and because Tenoso's option to foreclose on Plaintiff's property in the event of default violated Plaintiff's right of redemption under New York law. In an order dated March 11,

2004, this Court held that New York law does not prohibit the transfer of a deed in lieu of foreclosure as security for a debt, but does prohibit waiver of the right of redemption. Thus, a deed executed in lieu of foreclosure must be considered a mortgage, not an absolute conveyance, such that the loan recipient retains the right to redeem the mortgaged property.

Also in April 2003, Tenoso moved for judgment on the pleadings on his counterclaim, as well as on the claims by Plaintiff, pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). The motion was decided in the same March 11, 2004 order. The Court found that even when read in the light most favorable to Plaintiff, his pleadings failed to state a valid claim that the loan agreement was unconscionable or usurious. Tenoso's motion for judgment in his favor on the first count of Plaintiff's complaint was thus granted. The Court declined, however, to grant judgment on the pleadings as to Tenoso's counterclaim, in light of the parties' disputes over key issues of material fact (namely, whether the majority of the loan proceeds ever reached Plaintiff, and whether he bore responsibility for the later default).

On March 24, 2005, the Court dismissed, without prejudice, Counter-claimants' Amended Counterclaims ("ACC") because they were "indecipherable." The Court detailed precisely how Counter-claimants should endeavor to frame their Second Amended Counterclaims ("SACC"), and explicitly stated that "any further failure to abide by this Court's orders, instructions, and deadlines shall result in the dismissal of any and all of counterclaims by Hay, Griffin, and/or FMB Holdings, LLC with prejudice." (March 24 Order at 7.) Five days later, on March 29, 2005 Order, the Court issued another order, this time denying, without prejudice Defendant Tenoso's motion for summary judgment and denied, as premature, Plaintiff's request to conduct Rule 56(f) discovery.

DISCUSSION

Currently before the Court are four motions by the parties: Plaintiff moves to amend his original complaint; Tenoso moves for summary judgment on his counterclaim; Plaintiff moves to dismiss the counterclaims; and Plaintiff moves for Rule 11 Sanctions against Mr. Webb. The Court considers each of these motions in turn.

**I.**     ***Plaintiff's Motion to Amend the Complaint***

Plaintiff moves for leave to amend pursuant to Rule 15(a), which provides in pertinent part that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason -- such as [1] undue delay, [2] bad faith or dilatory motive . . . , [3] repeated failure to cure deficiencies by amendments previously allowed, [4] undue prejudice to the opposing party by virtue of the allowance of the amendment, [or (5)] futility of amendment.'" *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Although the decision of whether to allow a party to amend his complaint is left to the sound discretion of the district court, there must be good reason to deny the motion. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *see also S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979).

The Amended Complaint now includes Tenoso in the fraud claim. (*See* Am. Compl. ¶ 64-93.)[1] Plaintiff submits that it was only during discovery that he realized that Tenoso was

---

[1]Tenoso argues that the Amended Complaint also asserts a fraudulent transfer claim against him. This is unclear. The Third Cause of Action is captioned "Against All Defendants for Fraudulent Transfer," but the final paragraph states, "Due to the foregoing, [Plaintiff] is

involved in the fraudulent scheme. (*See* Aff. of Harold J. Levy, dated May 2, 2005 ("Levy Aff."), ¶¶ 8-9.) The Court considers each of the five factors to determine if there is any reason to deny Plaintiff's request.

A.  *Undue Delay*

Defendants assert that Plaintiff has unduly delayed in his request to amend the complaint. (*See* Def. Tenoso's Opp'n Mem. at 6.) Defendant relies primarily upon a number of cases in the Second Circuit that have held, for example, that a plaintiff had unduly delayed in requesting to amend "over four years" since the injury and "over two years" since the filing of the complaint. (*See id.* at 6-7 (citing to, *inter alia*, *Katz v. Morgenthau*, 892 F.2d 20, 22 (2d Cir. 1989); *Sala v. Gates Constr. Co.*, 155 F.R.D. 414, 415 (E.D.N.Y. 1994)).) Defendants' arguments are not entirely in sync with the caselaw, however, because it is well established that, as a general matter, mere delay does not provide a basis to deny leave to amend. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see also Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, 232 F.R.D. 169, 171 (S.D.N.Y. 2004); *Litton Indus. v. Lehman Bros., Kuhn Loeb*, 734 F. Supp. 1071, 1078 (S.D.N.Y. 1990) (granting motion to amend that was submitted over three years after filing of the complaint, since the plaintiff set forth "colorable grounds" for amendment and defendant would not have been unduly prejudiced); *cf. State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").

---

entitled to a judgment against Hay, Griffin, and FMB." (Am. Compl. ¶ 121.) Thus, it appears that the fraudulent transfer claim does not extend to Tenoso.

Though the original complaint was filed on June 27, 2002, Defendant Tenoso sought a stay of discovery, and was not deposed until October 8, 2004. (*See* Levy Aff., Ex. 4.) Plaintiff claims to have learned of the facts that prompted the amendment at issue during that deposition, thereby excusing any delay. Defendants make a somewhat compelling couter-argument that Plaintiff *should* have known of the facts that gave rise to Plaintiff's fraud claim before Defendant Tenoso's deposition. Ultimately, the Court thinks that even if Plaintiff could have submitted its proposed amendments somewhat earlier in the litigation, the delay was not inordinate given the procedural history of this dispute. As a result, even if Plaintiff did delay, the delay was not *undue*, and this factor weighs in favor of amendment. *See Urban Box Office*, 232 F.R.D. at 172.

**B.** *Bad Faith*

There is no argument of bad faith, so this factor weighs in favor of granting leave to amend.

**C.** *Previous Amendments*

There have been no previous amendments sought by Plaintiff. Consequently, this factor weighs heavily in favor of granting leave to amend.

**D.** *Undue Prejudice*

Defendants argue that an amendment at this juncture would be highly prejudicial because it would force the Defendants to "conduct discovery on the claims of fraud and fraudulent transfer," that would "incur greater litigation costs." (Def. Tenoso's Opp'n Mem. at 11.) In determining what constitutes undue prejudice, courts "generally consider whether the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of

the dispute." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (internal quotation marks omitted); *see also Urban Box Office*, 232 F.R.D. at 172.

Magistrate Judge Orenstein deemed discovery complete on November 9, 2004. Though Defendants assert that they would incur additional litigation costs regarding discovery, Defendants do not assert that those additional costs would be "significant." Defendants state that "resolution of this case, already three (3) years old, would be delayed" (Def. Tenoso's Opp'n Mem. at 12). It was Defendant Tenoso, however, who sought a stay of discovery until September 2004, so his assertion that it is Plaintiff who is attempting to delay resolution of this case is unpersuasive. Furthermore, no trial date has been set, so it is not certain that the ultimate resolution of this case will be delayed. Consequently, though the amendment may force the Court to re-open discovery, the Defendants' arguments asserting prejudice are not compelling. Defendants have not persuasively argued that the amendment would delay resolution of the dispute nor that it would cause "significant" additional litigation costs. Accordingly, this factor weighs in favor of amendment.

    **E.**    *Futility*

When the complaint contains allegations of fraud, Fed. R. Civ. P. 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity." The complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Acito*, 47 F.3d at 51 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Plaintiff has plead fraud with particularity. He states in his fraud claim that "[t]he Loan Agreement, Security Agreement, and Guaranty were created by Tenoso and Hay to give Zeki [Plaintiff] the false impression that the transaction was legitimate and that funds would be at his disposal to purchase the gold he desperately needed to continue his business." (*See* Am. Compl. ¶ 75.) This allegation identifies the statements that were fraudulent and identifies the parties responsible for those misstatements. Plaintiff also identifies when these statements were made–April 23, 2001 (*see id.* at ¶ 45)–and explains why these statements were fraudulent (*see id.* at ¶ 83).

Thus, there is no basis for the Court to conclude that the amendments would be futile. Defendants offer other arguments in support of futility, but those arguments are not based upon the pleadings. Any consideration of evidence would be unjustified when the Court is simply trying to determine whether the proposed amended complaint is adequate. Consequently, this factor weighs in favor of granting Plaintiff's motion.

In sum, each of the five factors weighs in favor of granting Plaintiff's motion to amend the complaint. That being the case, Plaintiff's request is granted.

## II.  *Defendant Tenoso's Motion for Summary Judgment*

Defendant Tenoso moves for summary judgment as to his counterclaim, whereby he seeks judgment against Plaintiff for all amounts owed under the Loan Agreement, Note, and Mortgage. (*See* Def. Tenoso's Summ. J. Mem. at 6.) Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Viola v. Philips Med. Sys. of N.*

*Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)). The Court has granted Plaintiff leave to amend his complaint, adding a claim that asserts that the various agreements between the parties were procured by fraud. That being the case, there is an issue of material fact as to whether the agreements between Plaintiff and Defendant Tenoso are valid. Clearly, then, there is an issue of material fact regarding the validity and enforceability of those contracts. Because the Court cannot grant summary judgment when there are genuine issues of material fact, the Court denies Defendant Tenoso's motion for summary judgment as to his counterclaim.

### III. *Plaintiff's Motion to Dismiss the Counterclaims*

Plaintiff moves to dismiss the counterclaims of Counter-claimants pursuant to Fed. R. Civ. P. 12(b)(6), on the grounds that the Second Amended Counterclaims ("SACC") submitted on May 13, 2005 are "frivolous" and "indecipherable." (*See* Pl.'s Mot. to Dismiss Mem. at 1.) The Court twice dismissed the counterclaims without prejudice. This is the third attempt by Counter-claimaints to submit an adequate set of counterclaims.

In response to Plaintiff's motion, Counter-claimaints submit a brief of pure rhetoric. Instead of addressing Plaintiff's arguments regarding the counterclaims, Counter-claimaints instead declare, "The *mise en scene* of these proceedings emanates from a background of Machiavellian intrigue, cunning deception, and sensational double *entendre*. Essentially, it is a text book example of myopic greed and clandestine chicanery designed and intended to conceal from respondents' knowledge a pre-existing business relationship between the movant and others . . . ."[2] (*See* Def. FMB's Opp'n to Mot. to Dismiss at 1-2.) Counter-claimants then cite to a vast

---

[2]The above-cited paragraph is identical to the opening of Counter-claimants' opposition to the prior motion to dismiss. Addressing Counter-claimants penchant for the opaque in the March 24 Order, the Court wrote, "Counter-claimants are to submit a further revision of their

array of cases and treatises, but barely address the content of their counterclaims or Plaintiff's arguments in support of his motion to dismiss. Because the relevance of Counter-claimants' arguments is an open question, it is difficult to have a serious discussion of Counter-claimants' legal arguments here.

Plaintiff goes to great lengths to demonstrate that the substance of the SACC is no different than the previously-rejected Amended Counterclaims ("ACC"). (*See* Pl.'s Mem. In Support of Mot. to Dismiss at 2-10.) The Court sees no reason to reiterate Plaintiff's observations here, beyond noting that its own perusal of the third set of counterclaims entirely supports Plaintiff's assertions.

In the March 24 Order, the Court dismissed Counter-claimaints ACC. The Court stated:

> It is unclear whether the "content" of the counterclaim is sufficient to state a cognizable RICO claim, because the 'reformatted' counterclaim is only slightly less indecipherable than its predecessor. And the Counter-claimants failed to submit the required RICO statement, in direct contravention of this Court's prior instructions. In sum, the Court's previously-expressed concerns regarding the timely administration of this case have not been assuaged.

(March 24 Order at 2.) With the SACC, Counter-claimants have again failed to address the Court's concerns. In the March 24 Order, the Court dismissed the AC *without prejudice* but issued an exhaustive list of directions, clearly articulating to Counter-claimants how a subsequent submission of counterclaims could pass muster. Counter-claimants entirely ignored the Court's instructions.

---

counterclaim. The counterclaim, and, for that matter, any other submissions to this Court in the future, must be written in *plain, simple English, devoid of any rhetorical flourishes*." (March 24 Order at 3.) Obviously, counter-claimants ignored this directive and submitted almost exactly the same brief. (*Compare to* Docket Entry No. 120.) The only difference is that the brief currently under consideration is seven pages longer.

The SACC is, in fact, more difficult to parse than the AC. Though the formatting is new and easier to read, the content is essentially identical, with one major change: the deletion of nearly forty paragraphs. The Court did not criticize Counter-claimants' prior attempts as being too long. Rather, the Court was critical of Counter-claimants for raising broad legal claims without any bases in the factual allegations. That failing is unchanged.

For example, Counter-claimants allege that Plaintiff and "the persons and entities [he] acted in concert therewith" engaged in the racketeering activities encompassing:

> Federal Principal and Aider and Abettor Liability, Federal False Oath, Federal Bankruptcy Fraud, Federal Mail Fraud, Federal Wire Fraud, Federal Intangible Personal Property Right Deprivation, Federal Racketeering, Federal Money Laundering, Federal Criminally Derived Property, Federal Interstate Transportation of Property Obtained by Fraud, False Pretense, and Conversion, and Federal Interstate Receipt of Transported Property Obtained by Fraud, False Pretense, and Conversion.

(SACC ¶ 61.) Though this is an impressive list, Counter-claimants do not spell out the elements of *any* of these alleged racketeering activities, or provide any connection between the factual allegations and these legal claims. It appears that Counter-claimants' strategy is to confuse and exhaust their adversary with rhetoric rather than confront any issue directly. The Court will not force Plaintiff to participate in this ruse.

Further frustrating any comprehensible reading of the SACC is the fact that Counter-claimants allege twenty-two RICO "persons" but provide no biographical information as to any of these individuals. (*See* SACC ¶ 2.) Individuals appear in the SACC with no explanation, and disappear almost as quickly. (*See, e.g.*, *id.* ¶ 12 (asserting that "Plaintiff consummated and has maintained a commercial relationship with Palazzo, Bernhardt, and DiMatteo in order to assure a constant revolving source of immediate capital liquidity," even though the SACC had not

previously mentioned Palazzo, Bernhardt, or DiMatteo, and does not explain why that relationship is relevant).) These biographical paragraphs were in the AC (*see* AC ¶¶ 2-23(b)), but Counter-claimants inexplicably omitted them from the SACC. Consequently, a reader is unable to conceive of how these individuals are connected, worked together, or had any type of common purpose that would support a RICO claim. *See*, *e.g.*, *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (holding that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct, the existence of which is proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit").

Another omission from the SACC is the required RICO statement. The Court specifically ordered Counter-claimants to provide a RICO statement along with their SACC. (*See* March 24 Order at 4.) Counter-claimants did not do so. As a result, the third set of counterclaims lacks the very thing that the March 24 Order demanded.

At the close of the March 24 Order, the Court warned Counter-claimants that "any further failure to abide by this Court's orders, instructions, and deadlines shall result in the dismissal of any and all of counterclaims by Hay, Griffin, and/or FMB Holdings, LLC with prejudice." (*Id.* at 7.) That time has come. Counter-claimants have completely disregarded this Court's instructions and have submitted, for a third time, a completely unacceptable set of counterclaims. The SACC remains indecipherable and Counter-claimants' brief retains the proscribed rhetorical flourishes and refuses to address the issues germane to the Court's concerns. Consequently, Plaintiff's motion to dismiss the counterclaims is granted *with prejudice*.

**IV.**   ***Rule 11 Sanctions***

Plaintiff moves for Rule 11 sanctions against Counter-claimants' attorney, Mr. Webb, "for serving and filing with the Court what he knows, or should after an inquiry reasonable under the circumstances know, to be pleadings which contain false factual contentions . . . and submitted to harass plaintiff, stall this action, and increase the costs of prosecuting his clients." (Pl.'s Mem. in Supp. of Rule 11 Sanctions at 1.) Mr. Webb opposes the motion by again resorting to rhetorical flourish with no substance. (*See* Counter-claimant's Opp'n to Rule 11 Sanctions at 1-2 (opening his brief, again, with the declaration, "The *mise en scene* of these proceedings emanates from a background of Machiavellian intrigue, cunning deception, and sensational double *entendre*.").) Plaintiff has complied with the "safe harbor" provisions of Rule 11(a).

A Rule 11 violation occurs "when it appears that a pleading has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 360 (S.D.N.Y. 2005) (citations and internal quotation marks omitted); *see also* Fed. R. Civ. P. 11(b)(1)-(3). The test is whether the attorney's conduct was objectively reasonable at the time the pleading was signed. *See Greenberg v. Chrust*, 297 F. Supp. 2d 699, 703 (S.D.N.Y. 2004). Though sanctions should "be imposed carefully lest they chill the creativity essential to the evolution of the law," *Greenberg*, 297 F. Supp. at 703, ultimately, "Rule 11 sanctions are designed to deter baseless filings . . . ." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 369 F.3d 91, 97 (2d Cir. 2004) (citation omitted).

The Advisory Committee Notes accompanying the 1993 Amendments to Rule 11 describe factors to be considered when determining whether sanctions are warranted and, if so, the type and degree of any sanction that should be imposed. Those factors include: (1) whether the improper conduct was willful, or negligent; (2) whether it was part of a pattern or activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case. *See Simpson v. Putnam County Nat. Bank of Carmel*, 112 F .Supp. 2d 284 (2000) 291-92 (S.D.N.Y. 2000).

The facts of this case support sanctions under each of the above factors. First, the improper conduct was willful. The SACC clearly had absolutely no chance of success because the Court informed Mr. Webb in its previous orders that the indecipherable pleadings were entirely inadequate. Furthermore, Mr. Webb's conduct was "objectively unreasonable" to the extent that the Court dictated the content and organization necessary for the SACC to have any merit, and Mr. Webb submitted the SACC with complete disregard for the Court's order. By submitting essentially the same indecipherable set of counterclaims for a third time, in direct defiance of two explicit orders from this Court, Mr. Webb was "harass[ing] or to caus[ing] unnecessary delay or needless increase in the cost of litigation." Rule 11(b)(1).

As for the second factor, this is the third, nearly identical set of counterclaims, establishing that it was part of a pattern of activity. Third, the deficiencies infect the entire SACC. Fourth, Mr. Webb has participated in similar conduct in other suits. (*See* Pl.'s Mem. In

Supp. of Rule 11 Sanctions, Ex. 1).[3] Fifth, the filing of a knowingly inadequate SACC has delayed these proceedings and caused Plaintiff's and this Court to engage in unnecessary research and analysis  And, sixth, Mr. Webb is educated in the law.  Thus, all of the relevant factors are satisfied, thereby justifying sanctions.

The Court also notes that the fact that the counterclaims allege RICO violations further justifies sanctions against Mr. Webb. *See, e.g., O'Malley v. New York City Transit Authority*, 896 F.2d 704 (2d Cir. 1990) (imposing sanctions for filing frivolous RICO action); *Katzman*, 167 F.R.D. at 660 (S.D.N.Y.1996); *Levy v. Aaron Faber, Inc.*, 148 F.R.D. 114, 123 (S.D.N.Y. 1993) (imposing sanctions where "even a cursory investigation into the pleading requirements for RICO would have revealed the inadequacy of [plaintiff's] RICO pleading").  The utter inadequacy of the RICO claims alone would justify sanctions given the stigma attached to RICO allegations.  *See Katzman*, 167 F.R.D. at 660 (noting that Rule 11's deterrence value is particularly important in the RICO context, as the commencement of a civil RICO action is highly likely to have a stigmatizing effect on those named as defendants).

Plaintiff's request that the Court sanction Mr. Webb in the amount of "$50,000, together with costs, expenses, interest, and such additional sanctions as the Court deems it just and proper to impose." (Pl.'s Mem. in Supp. of Rule 11 Sanctions at 2.)  Despite the vexatiousness of Mr. Webb's conduct, an award of that magnitude would be excessive.  Instead, the Court directs Plaintiff to submit, in detail, the attorney's fees and costs it incurred in the preparation of its

---

[3]In *FMB Holding LLC v. Goldwerks*, 02-CV-2250 (E.D.N.Y. March 21, 2003), Bankruptcy Judge Stan Bernstein held that "[t]here is no doubt that [Mr. Webb] knowingly and intentionally violated the automatic stay. . . . His willful indifference to the automatic stay cannot be tolerated." (*See* Pl.'s Mem. In Supp. of Rule 11 Sanctions, Ex. 1 at 4.)  The bankruptcy court sanctioned Mr. Webb in the amount of $2,000.

September 14, 2005 Motion to Dismiss the Counterclaims, including the memorandum of law and the reply memorandum.

*CONCLUSION*

Before closing, the Court must address the unseemly conduct of the parties in this case up to this point. First, the parties have repeatedly failed to abide by the Court's Individual Practice Rules, particularly the "Bundle Rule." (*See* Individual Practice Rules 2G.) Because of these failures, the docket is, for all intents and purposes, impenetrable. For the remainder of this case, any documents submitted that are not in perfect compliance with the Court's Individual Practice Rules will be treated as nullities. "Perfect compliance" refers not only the rules regarding filings and schedulings, but also the formatting of the parties' briefs. For example, any documents submitted that exceed the Court's prescribed page limit will be dismissed out of hand.

Second, the Court will also no longer tolerate the vituperative language that permeates the parties briefs. The parties are directed to refrain from referring to one another as "crooks," "scoundrels," "cheats," or "con artists" in their submissions to this Court. The stream of histrionics frustrates the Court's task, and merely exacerbates the dispute.

In conclusion, Plaintiff's motion to amend the original complaint is GRANTED; Defendant Tenoso's motion for summary judgment is DENIED; Plaintiff's motion to dismiss the counterclaims of Counter-claimants is GRANTED; and Plaintiff's motion for Rule 11 Sanctions against Mr. Webb is GRANTED. The Amended Complaint must be filed with the Clerk's Office by April 21, 2006. As for the Rule 11 sanctions, Plaintiff must submit its documents detailing the costs incurred in the preparation of the motion to dismiss the SACC by April 21, 2006. Mr.

Webb may file any opposition by May 22, 2006.  And Plaintiff may submit a reply by June 5, 2006.  Again, these submissions must comply with the Court's "Bundle Rule."

**SO ORDERED.**

Dated: Central Islip, N.Y.
       March 21, 2006                                  _____/s/_____
                                                       Denis R. Hurley
                                                       United States District Judge